IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | | |
|---|---|---|
| **JARUS SMITH, #359993,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **NO. 1:22-cv-00009** |
| | ) | |
| **STATE OF TENNESSEE,** | ) | **JUDGE CAMPBELL** |
| | ) | **MAGISTRATE JUDGE HOLMES** |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION</u>

Petitioner Jarus Smith, who is incarcerated at the Northeast Correctional Complex in Mountain City, Tennessee, has filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his convictions and sentences imposed by the Hickman County Circuit Court for facilitation of attempted second-degree murder, possession of contraband in a penal institution, and two counts of aggravated assault. (Doc. No. 1). Respondent has filed an Answer (Doc. No. 9), and Petitioner has filed a reply (Doc. No. 15). This Court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the Court finds that Petitioner is not entitled to relief. The petition therefore will be denied, and this action will be dismissed.

## I.    PROCEDURAL HISTORY

Petitioner was indicted in the Hickman County Circuit Court on four counts of attempted first-degree murder, six counts of aggravated assault, and one count of possession of contraband in a penal institution. (Doc. No. 7-1 at 3−8). The indictment was later amended to drop several charges. (*Id.* at 59−60). Before trial, the trial court appointed experienced "elbow counsel" to assist trial counsel. (Doc. No. 7-19 at 23). After a jury trial, Petitioner was convicted of one count of facilitation of attempted second-degree murder (a lesser-included offense of attempted first degree

murder), one count of possession of contraband in a penal institution, and two counts of aggravated assault. (Doc. No. 7-1 at 62−66, 76−79). The trial court merged one of the convictions for aggravated assault with the conviction for facilitation of attempted second-degree murder. (*Id.* at 78). The court sentenced Petitioner to consecutive 10-year prison terms for facilitation of attempted second-degree murder, one count of aggravated assault, and one count of possession of contraband in a penal institution, for a total of 30 years. (*Id.* at 76−79).

On direct appeal, Petitioner argued, as relevant here, that his sentences were excessive. (Doc. No. 7-10 at 22−24). The Tennessee Court of Criminal Appeals affirmed Petitioner's convictions and sentences. (Doc. No. 7-13); *State v. Smith*, No. M2014–01130–CCA–R3–CD, 2015 WL 4656553 (Tenn. Crim. App. Aug. 6, 2015). The Tennessee Supreme Court denied permission to appeal. (Doc. No. 7-17).

After his direct appeal, Petitioner filed a pro se petition for state postconviction relief raising the following claims:

- trial counsel was ineffective for failing to file a motion for severance;

- trial counsel was ineffective for failing to advise Petitioner of his right to a 12-person jury;

- the trial court denied Petitioner due process by failing to advise him of his right to a 12-person jury;

- trial counsel was ineffective for failing to adequately investigate and failing to involve Petitioner in trial preparation;

- trial counsel was ineffective for not presenting a defense based on self-defense;

- trial counsel was ineffective for failing to advise Petitioner whether or not to testify;

- trial counsel was ineffective for failing to file a written motion for continuance;

- trial counsel was ineffective for failing to seek a change of venue;

- trial counsel was ineffective for failing to adequately prepare for trial;

- trial counsel was ineffective for failing to introduce the complete video evidence;

- the trial court denied Petitioner the right to counsel when the court did not allow Petitioner additional time to hire counsel of his choosing;

- trial counsel was ineffective for failing to advise Petitioner of the full range of sentences he faced if convicted;

- appellate counsel was ineffective for failing to ensure a complete record on appeal; and

- cumulative error.

(Doc. No. 7-18 at 4−29). After an evidentiary hearing, the trial court denied relief. (*Id.* at 92−119).

On appeal from the denial of postconviction relief, Petitioner argued that (1) he was denied the right to a 12-person jury and (2) trial counsel was ineffective for failing to properly advise Petitioner of his right to a 12-person jury. (Doc. No. 7-21 at 26−34). The Tennessee Court of Criminal Appeals affirmed. (Doc. No. 7-23); *Smith v. State*, No. M2020-00816-CCA-R3-PC, 2021 WL 3674117 (Tenn. Crim. App. Aug. 19, 2021). The Tennessee Supreme Court denied permission to appeal. (Doc. No. 7-28).

Petitioner next filed a petition for writ of habeas corpus in this Court. (Doc. No. 1). In it, he raises the following grounds for relief:

1) the trial court lacked authority to sentence Petitioner to "Range II" sentences under Tennessee law;

2) trial counsel was ineffective for

    a. failing to file pretrial motions;

    b. failing to sever from co-defendants;

    c. failing to advise Petitioner whether or not to testify;

    d. failing to adequately prepare for trial;

    e. failing to ensure a complete record on appeal;

    f. failing to file a written motion to withdraw as counsel;

3

g.  failing to advise Petitioner of his right to a 12-person jury; and

h.  allowing elbow counsel to take over decision making and trial strategy;

3)  Petitioner's convictions for attempted second degree murder and aggravated assault of the same victim violated double jeopardy; and

4)  elbow counsel was ineffective for failing to adequately investigate and failing to discuss trial strategy with Petitioner.

(Doc. No. 1 at 8–13).[1]

## II.  SUMMARY OF THE EVIDENCE

### A.  Trial Evidence

The Tennessee Court of Criminal Appeals summarized the evidence from Petitioner's jury trial as follows:

This case arises from prison unrest inside the Turney Center Industrial Complex on May 4, 2012, involving the Defendant and fellow inmates, Adam Dansby Frazier and Javoris Sparkman.

\* \* \*

Investigator Nicky Jordan, a special agent with the Tennessee Department of Correction ("DOC"), Division of Law Enforcement, testified that Turney Center is a "medium/close security facility[,]" meaning that it is "a prison where inmates that have a substantial amount of time go to do that time." According to Inv. Jordan, the prison houses approximately 1,250 inmates with about 128 prisoners per pod, and the guards at Turney Center do not carry weapons because of the high inmate-to-guard ratio.

On May 4, 2012, both Officers Hellam and Miller were working in different areas of the prison and responded from their respective stations to a "code"1 in Unit 1, Pod B following a disturbance. Pursuant to standard policy, the prison guards were attempting to move all inmates back into their respective prison cells to quell any further uprising. When Officer Hellam arrived in the unit, he heard "a lot of yelling and screaming going on," and he attempted to "hurry up and get everybody locked down, try to contain the situation, get control of it." In so doing, Officer Hellam found himself in the midst of a group of inmates, and "the next thing" that he remembered was "fighting [his] way through" that group. Otherwise, he did not remember many details about the attack except thinking that "[he] just got

---

[1]    The Court adopts Petitioner's numbering of his claims in the petition.

punched" and "seeing Officer Miller ... [being] assaulted by an inmate." Officer Hellam was asked to explain his injuries:

> I received a stab wound to the right side of my head, lost vision in my right eye, hearing in my right ear. They don't know if they can repair it or what's causing all the pain or anything, and they don't know what else they can do. My eyesight returns every so often and then it goes away. Sometimes I can make shapes out and that's it. Like I said, they don't know if they can fix it. Along with PTSD. There's really not much else they can do.

Photographs of his injuries were admitted as trial exhibits, showing a stab wound to the head and bleeding from the ear.

Officer Miller explained that, when she arrived on the second floor walkway of Unit 1, Pod B, she was "stabbed in the face, [she] was stabbed six times across the back and the shoulder[s]," and she was beaten "with a sock full of dominoes." Officer Miller described the facial wound: The "weapon went inside ... my face, it cut my jaw open, it cut my tongue partial way out, and it's right on the edge of the motor nerve." Photographs of her injuries were also admitted into evidence, showing a jagged, crescent-shaped stab wound to her face, profuse bleeding, and multiple bruises.

Video surveillance footage from Turney Center on May 4, 2012, shows the Defendant, Sparkman, and Frazier standing on a second-floor walkway of Unit 1, Pod B while other inmates wandered about. The Defendant can be seen holding what appears to be a sock within which some sort of weighted object is concealed, and co-defendant Frazier can be seen holding a knife. The Defendant is swaying the sock back and forth as he walks about.

Within a short period of time, the three men encounter another group of inmates along the walkway. The groups come to a standoff, and a fight looms. A short time later, Officer Hellam appears on the walkway and walks from one side to the other, eventually disappearing from view of the camera. He then reappears on the walkway, followed by the Defendant, Sparkman, and Frazier. Around that same time, Officer Miller, who has arrived upstairs, attempts to assist Officer Hellam in separating the two groups by speaking with co-defendant Sparkman.

Both officers are now amongst the group of inmates, and co-defendant Sparkman then looks at Officer Hellam and suddenly punches him in the side of the face. Officer Hellam ducks, and the Defendant is visible swinging the weighted sock at him. Officer Hellam escapes from the group, but Officer Miller is now in their midst. Co-defendant Frazier can be seen forcibly stabbing Officer Miller at least three times, while the Defendant swings his weighted sock at her. Officer Miller also manages to escape. However, all three men can still be seen on the walkway strutting together and attempting to progress towards Officer Miller, and the Defendant is still swaying his sock back and forth in an aggressive manner. They

only completely stop forward progress once additional officers arrive on the walkway. The Defendant, Sparkman, and Frazier then retreat to a cell. Just before he enters the cell, co-defendant Frazier can be seen tossing something along the walkway. Also, Officer Hellam can be seen staggering across the lower level of the unit where he collapses on the floor. The attack on the two prison guards lasted only seconds.

Other Turney Center correctional officers testified at trial and identified each of the three men and the officers on the surveillance video. These same officers also described the injuries they viewed to Officers Miller and Hellam that day.

Inv. Jordan was also asked about what was classified as "contraband" in the Turney Center. He agreed that some items by their very nature qualified as contraband, like marijuana or a sharp knife, and that an inmate could not have such an item without the express written consent of the chief administrator. Inv. Jordan did not know of any instance where an inmate had been given written consent to possess a knife, and none of these three defendants had said consent from the chief administrator. He described legal items which could be fashioned into a weapon:

> An inmate would be allowed to purchase soap from the commissary in order to take showers, to clean hisself [sic], but he wouldn't be allowed to take that soap and put it in a sock and use it as a battering ram, or an inmate would not be allowed to take items such as gaming–if he was allowed to have domino[e]s and then put those into a sock and use those as a weapon, or pick up rocks off the yard and put them in a sock and use them as a weapon.

He further stated that an item such as a soda can was not contraband "until it [was] used for a purpose other than what it was meant to be" used for, such as assaulting someone. According to Inv. Jordan, the term "weapon" as used in Tennessee Code Annotated section 39–16–201 was "a broad range legal term that [the DOC] enforce[d]." Inv. Jordan explained again, "If he had ... a legal item and used it as a weapon; therefore, it would become a weapon and contraband."

When Inv. Jordan arrived at Turney Center on May 4, 2012, he found the defendants in Cell 233. Following the attack, a search was performed of all cells in the unit, and Inv. Jordan confirmed that no weapons were found therein, not a knife, sock, or dominoes. Six knives were discovered in the common areas of Unit 1, Pod B, according to Inv. Jordan, but none of them were traceable to any particular inmate.

With this evidence, the State rested. … [T]he defendants elected not to testify and chose not to present any proof.

(Doc. No. 7-13 at 2−5) (footnotes omitted).

## B. Excused Juror

The Tennessee Court of Criminal Appeals on postconviction review summarized the events that led to one of Petitioner's jurors being excused after the close of evidence:

> The Petitioner was represented by two attorneys at trial, "trial counsel" and "elbow counsel." At trial, during a lunch break occurring after the alternate juror was excused and the jury retired to deliberate, the trial court called the parties and their attorneys back to court at 1:10 p.m. The court announced that one of the jurors had "been sick several times" that morning and once after the jury retired; the juror informed the court that he did not feel capable of continuing to serve on the jury.

> The trial court noted that the alternate juror was still in the building and had been asked to sit in the trial court's office. The alternate juror reported having spoken to one of the victims, Paula Miller, in the courthouse and telling her "that he hoped she got to feeling better[.]" The court opined that the sick juror appeared to be contagious and that the court would excuse him "unless there[ was] a strenuous objection." The court stated that deliberations could proceed with eleven jurors or with the alternate juror, and it offered to call the alternate juror to the stand for questioning about his ability to be fair and impartial. At this juncture, it was apparent that one of co-defendant Frazier's attorneys, "Mr. Bates, III," was attempting to reach his colleague, named "Mr. Bates, IV," by telephone to discuss this issue, and the court declared an in-court recess of unknown duration.

> When the parties and their counsel reconvened, the State said that it had no objection to the alternate juror. Mr. Bates, III, stated, "We are not. We would ask for [eleven]. We're not asking for a mistrial; we're asking for [eleven]." The trial court then offered to call the sick juror to the stand for questioning, although the court noted that he "[did not] look well." Trial counsel objected to the alternate juror, and elbow counsel indicated his agreement. Elbow counsel asked the court for an opportunity to speak to the Petitioner privately about proceeding with eleven jurors. The following exchange occurred:

> > THE COURT: Well, we'll go forward with [the sick juror] before I'll agree to—if you're going to ask for a mistrial or something like that.

> > [ELBOW COUNSEL]: No, we're good.

> > THE COURT: I'll force [the sick juror] to get better. (Laughter.)

> > Mr. Hinson [co-defendant Sparkman's counsel], as it relates to [the alternate juror], are you objecting to him?

> > MR. HINSON: Based upon what I've heard, I would, and I certainly don't want to force a sick man to be here.

The trial court stated that it "would give [the sick juror] some time to try to get to feeling better and then keep him, as opposed to—[.]" Mr. Hinson expressed concern that this might "force the jurors to try to rush this up" and stated that he was "fine with eleven." The court addressed co-defendant Sparkman and asked if he was "okay with that"; co-defendant Sparkman replied negatively. The court asked for him to elaborate, and co-defendant Sparkman said, "Really, I [would] rather for you to see if the guy who got sick want[ed] to be on there first. If he [does not] want to be on there, then we'll accept [eleven]."

The trial court addressed the Petitioner and asked if he was amenable to eleven jurors. The Petitioner replied by asking for his available options. The court responded, "To have [the sick juror] serve." The Petitioner said, "I wouldn't want him to be [on the jury] if he [was not] able to give his full potential to—[.]" The trial court asked the court deputy to bring in the sick juror.

The trial court asked co-defendant Frazier if he objected to eleven jurors. Co-defendant Frazier stated, "No, I was just waiting on—[.]" Mr. Hinson interjected and said that co-defendant Sparkman had changed his mind. The court asked co-defendant Sparkman if he would be satisfied with eleven jurors, and he responded affirmatively. Co-defendant Sparkman added that the sick juror "wouldn't be clear," so he would rather have the eleven jurors who had heard the proof. The court asked if anyone was forcing co-defendant Sparkman to "do this," and he replied negatively. The following exchange occurred:

> THE COURT: Okay.
>
> How about you, [the Petitioner], do you agree or are you okay with [an eleven]-person jury?
>
> [THE PETITIONER]: Yes, Sir.
>
> THE COURT: Is anybody forcing you to do this, Sir?
>
> THE PETITIONER: No, Sir.

The trial court asked co-defendant Frazier to repeat his assent to proceeding with eleven jurors, and Mr. Bates, III, answered for him. The court asked co-defendant Sparkman and the Petitioner again if they had been "forced into this in any way," and both answered negatively. The court also asked both of them to confirm that this was "freely and voluntarily" their decisions, and both of them answered affirmatively. The jury-out hearing concluded at 1:22 p.m.

(Doc. No. 7-23 at 2−4).

## C. Postconviction Proceedings

The Tennessee Court of Criminal Appeals summarized the testimony provided at the postconviction hearing as follows:

> At the first post-conviction hearing on August 28, 2017, the Petitioner testified that trial counsel was appointed at the arraignment and that the case was pending for about one year before the trial in circuit court. According to the Petitioner, he met with trial counsel five or six times at the courthouse. Trial counsel eventually filed a pretrial motion to continue; the Petitioner stated that he and trial counsel "had a talk" and that trial counsel knew that the Petitioner was trying to retain another attorney. At the motion hearing, trial counsel requested that the trial court grant a continuance in order for the Petitioner to retain another attorney. The Petitioner averred that trial counsel told the judge that "he wasn't prepared to defend [the Petitioner]" due to inexperience and the severity of the sentence the Petitioner was facing. The trial court denied the motion but appointed elbow counsel to assist trial counsel. The Petitioner met with elbow counsel for fifteen minutes on the day he was appointed and a second time on the first day of jury selection.

> The Petitioner testified that trial counsel continued to represent him on direct appeal and that this court's opinion indicated that the issue of whether the trial court properly denied the motion to continue was waived for lack of an adequate record. When asked whether he wanted any additional issues raised on direct appeal, the Petitioner responded affirmatively and asserted that he wanted to raise his not having been granted a severance and an issue related to his not having had a weapon during the incident.

> Relative to jury deliberations, the Petitioner recalled the trial court's dismissing the alternate juror and a juror's falling ill. The Petitioner did not remember whether the juror became ill before or after the alternate was excused. He agreed that the trial court asked the parties to agree to proceed with eleven jurors. According to the Petitioner, he asked trial counsel what other options they had, and trial counsel responded that no other options existed. The Petitioner stated, "I don't ... know the law, but I do know we [were] supposed to have a [twelve]-person jury." The Petitioner said that after discussing the issue with trial counsel, he felt "like [he] was forced to go ahead ... with the [eleven]." The Petitioner averred that the trial court and trial counsel never informed him that he had a constitutional right to a twelve-person jury. The Petitioner said that he did not feel able to ask the trial court for a twelve-person jury. The Petitioner stated that he did not understand that trial counsel could have "asserted [the Petitioner's] constitutional rights" if the Petitioner had so requested. The Petitioner affirmed that he "didn't actually know [he] had a constitutional right to stand firm and tell [the trial court] that [he] wanted" twelve jurors. The Petitioner stated that after trial counsel told him no other options existed, the Petitioner agreed to go forward with the eleven-person jury because he felt he "had to proceed as it was."

9

At the second evidentiary hearing on September 25, 2017, the post-conviction court received the trial transcript and exhibits as a collective exhibit to the post-conviction hearing. On cross-examination, the Petitioner testified that he did not understand that he had a right to a twelve-person jury. He elaborated, "I understood I had a right to a jury, but not [an eleven-person] jury. I thought it was supposed to [have] been a [twelve]-person jury, right." The prosecutor responded, "Okay. So you understood you had a right to a [twelve]-person jury?" The Petitioner answered affirmatively.

The Petitioner affirmed that he had pled guilty or no contest in multiple previous cases. When asked whether on those occasions the judge had explained to the Petitioner his right to a jury trial, the Petitioner responded that he did not "really recall." The Petitioner stated that in a previous case, he had retained an attorney; the Petitioner averred that the attorney did not explain "specifics about" his right to a jury and only explained that they had to sign paperwork. The Petitioner reiterated that he did not "really know all the specifics that c[a]me along with a jury trial."

The Petitioner acknowledged his having pled guilty in June 2010 to the sale of cocaine in a drug free zone. When asked whether the judge and the Petitioner's attorney explained his right to a unanimous jury verdict and a twelve-person jury, the Petitioner stated that he did not recall "all the things that happened" in court at the plea hearing and only remembered signing the plea agreement and going to prison. The Petitioner also acknowledged that he pled guilty in March 2003 to possession of Xanax for resale.

After post-conviction counsel raised an objection regarding the factual basis of the State's asking whether the Petitioner was advised of his right to a twelve-person jury during the guilty plea colloquy, the post-conviction court took judicial notice of the questions typically asked by the trial court during a plea colloquy. The post-conviction court noted that it had performed such colloquies "thousands" of times and that it did not recall ever advising a defendant of the right to a twelve-person jury. The court found that the State's possessing a judgment form did not provide sufficient factual basis to question the Petitioner about whether he was specifically advised about being entitled to a twelve-person jury.

The Petitioner testified that at the time of his trial in this case,

> We really didn't go into detail about the specifics about the jury. Just common sense I knew a little bit about it's supposed to be [a twelve-]person jury or whatever like that, but I never knew the specifics of the jury as far as the alternates or anything of that nature. I [did not] know [any]thing about that.

The Petitioner recalled the trial court's stating that one of the jurors became ill, although he denied that the trial court presented him with any options for how to proceed. The Petitioner stated that he spoke only to trial counsel about the sick juror

and that he did not speak to elbow counsel. He later said, though, that he did not remember whether he discussed the matter with elbow counsel.

Upon examination by the post-conviction court, the Petitioner testified that to his recollection, the trial court only informed him that a juror had fallen ill and did not say anything more about the "composition of the jury." On redirect examination, the Petitioner reiterated that no one told him about his right to a twelve-person jury. He stated that he asked trial counsel about what other options he had and that trial counsel said they had no other option than to proceed with eleven jurors.

Elbow counsel testified that after graduating from law school, he worked as an assistant district attorney from 1992 until 2011, when he was appointed as a Circuit Court judge. In 2012, he left the bench to enter private practice in criminal and family law. Elbow counsel recalled that the trial court asked him to assist trial counsel with the jury trial portion of the Petitioner's case. Relative to the sick juror, elbow counsel stated that after the jury had retired to deliberate, the trial court announced that one of the jurors had fallen ill. The trial court "thought about calling one of the alternates who had left," but "[e]veryone" objected to the alternate's returning because the alternate conversed with one of the victims, Paula Miller, in the courthouse as the alternate was leaving. Elbow counsel stated that the trial court presented as options that they could proceed with eleven jurors or wait a while and see if the sick juror recovered. Elbow counsel noted that "it may have been intimated to [the trial court] that a mistrial was going to be requested" and that the trial court made clear that it would not grant a mistrial. Elbow counsel stated that he and trial counsel thought they "had a good jury, favorable jury to [the Petitioner]" and that all of the co-defendants agreed to proceed with eleven jurors.

Elbow counsel testified that although he did not "have a specific recollection of wording" he used, "there [was] absolutely no question whatsoever that [he] would have told" the Petitioner about his right to twelve jurors. Elbow counsel elaborated, "I'm not going to let any man or any woman go to trial with [eleven] jurors and not tell them that they have an absolute right to [twelve]. I mean that's just fundamental." Elbow counsel reiterated that he would have told the Petitioner that he had a right to twelve jurors and that he would have asked the Petitioner to decide whether they would wait for the sick juror to recover or proceed with the eleven remaining jurors. Elbow counsel stated that he "probably" would have advised the Petitioner to go forward with eleven jurors unless counsel believed the sick juror was "just so far in favor of the defense[.]"

On cross-examination, elbow counsel testified that he did not seek a mistrial after the co-defendants objected to recalling the alternate juror because the trial court "made it clear that a mistrial was not going to take place." Elbow counsel acknowledged that he did not move for a mistrial and that as a result, he could not "appeal that decision." Elbow counsel noted, though, that he believed the trial court would adjourn for as long as necessary for the sick juror to recover and that he did not believe a reason existed to request a mistrial. Elbow counsel repeated that he would have told the Petitioner, "[Y]ou have the absolute right to a [twelve]-person

jury, period, which one do you want?" Elbow counsel continued that "any decent attorney" would advise his client of such and that he "definitely would have said that."

Elbow counsel acknowledged that to his recollection, the trial court "may [have said] something about" having twelve jurors, but counsel did not believe the court informed the co-defendants on the record that they had a constitutional right to twelve jurors. Elbow counsel stated that his conversation with the Petitioner occurred at the counsel table and lasted about two minutes. Elbow counsel agreed that in his opinion, the trial court gave the co-defendants a "free and voluntary" opportunity to waive a twelve-person jury. Elbow counsel stated that although the trial court joked about "call[ing] a sick person," it was "clear to everyone" that the court would wait for the juror to recover. Elbow counsel said that in his experience, the trial court "always in any case [bent] over backwards to make certain that the defense [could] put on everything they [could] possibly put on in a trial[.]" He added that the trial court customarily "gave the defense pretty much what they wanted during trial" and that if it were needed, the court would have waited for two days to reconvene the jury.

Elbow counsel testified that the trial court's pronouncement that it would not grant a mistrial did not dissuade him from making such a motion to preserve the issue for appeal. He again noted that the trial court's willingness to wait until the sick juror had recovered made a mistrial unnecessary.

Trial counsel testified that he had been licensed to practice law since late 2010, that the Petitioner was "just nervous" about his case being trial counsel's first jury trial, and that the trial court appointed elbow counsel in response to the Petitioner's concerns. Trial counsel stated that when the sick juror issue arose, elbow counsel discussed it with the Petitioner for "less than two minutes" while the trial court discussed it with co-defendants' attorneys; trial counsel noted that he "was trying to listen to that and keep up with what was being said." Trial counsel agreed that he wrote the direct appeal brief and that the trial transcript did not reflect that any of the co-defendants were advised of their right to twelve jurors. He also agreed that neither he nor the co-defendants' attorneys moved for a mistrial. Trial counsel noted that "the way it was handled by the [trial court] left [him] with the impression that [he] couldn't appeal it." Trial counsel said that he did not have enough time to discuss with elbow counsel a possible motion for a mistrial. Trial counsel stated that he did not "know that it was ever said [in court that] they had a constitutional right to" twelve jurors.

When asked whether the co-defendants and their attorneys were permitted time to discuss how they wished to proceed, trial counsel responded negatively. He recalled that co-defendant Frazier's first-chair attorney was at lunch when the sick juror issue arose and that the trial court proceeded before the attorney returned to the courthouse. Although co-defendant Frazier's second-chair attorney was present during the relevant events, trial counsel believed that co-defendant Frazier's first-chair attorney was counsel of record.

12

Trial counsel testified that he did not think "it was ever said on the record [that the Petitioner] had the right to a [twelve]-person jury." He stated that to his recollection, the Petitioner asked the trial court for his options and the trial court replied, "[Y]ou can ... go with [eleven], you can go with the alternate or you can go with the sick guy and that's it, and ... no matter what, I'm not granting a mistrial." Trial counsel agreed that the trial court made its statement about a mistrial before any such motion was made, although he noted that the court "might have cut one of the defense attorneys off who ... was about to say it[.]"

Trial counsel agreed that in order to effectively waive a constitutional right, the waiver had to be knowing and voluntary. Trial counsel stated that he filed the motion for new trial and represented the Petitioner on direct appeal. He denied researching whether a "trial conducted by [eleven] jurors" was constitutionally valid. Trial counsel stated that he did not think the issue was one that could be raised on appeal. He said that the Petitioner's appeal was the third one he had handled, although it was the first appeal from a jury verdict.

(Doc. No. 7-23 at 4–9).

### III. SUMMARY OF THE EVIDENCE

#### A. Procedural Default

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court . . ., thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted). In Tennessee, a petitioner is "'deemed to have exhausted all available state remedies for [a] claim'" when the claim is presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 401 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39).

A procedural default can occur in one of two ways. First, a procedural default may occur if the state court actually "relied on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U. S. 320, 327 (1985). Second, if a petitioner

13

fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a claim, the claim is "technically exhausted" but procedurally defaulted. *Woodford v. Ngo*, 548 U. S. 81, 126 (2006).

A petitioner may obtain merits review of a procedurally defaulted claim by demonstrating "cause and prejudice" for the default. *Sutton v. Carpenter*, 745 F.3d 787, 791 (6th Cir. 2014). To establish cause, the petitioner must show that "some objective factor external to his defense impeded his ability to comply with the state's procedural rule." *Bies v. Sheldon*, 775 F.3d 386, 396 (6th Cir. 2014). To establish prejudice, a petitioner must demonstrate that the constitutional error "'worked to his actual and substantial disadvantage.'" *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis omitted)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

**B.  Merits Review**

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S.C. § 2254(d). Under this provision, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

14

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—instead, the federal court must find that the state court's application was "objectively unreasonable." *Id.* (quotation marks omitted). Review under Section 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

To clear the bar of Section 2254(d)(2), a petitioner must show that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations may be found unreasonable only "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)).

15

## IV. ANALYSIS

Petitioner identifies four grounds for relief, including ineffective assistance of trial counsel based on multiple bases for counsel's alleged ineffectiveness. (Doc. No. 1 at 8−13). As explained below, nearly all of these claims and subclaims are procedurally defaulted, and Petitioner has not demonstrated any basis to excuse the defaults. And Petitioner's lone non-defaulted claim—that trial counsel was ineffective for failing to properly advise him regarding his right to a 12-person jury—does not warrant habeas corpus relief under 28 U.S.C. § 2254(d).

### A. Procedurally Defaulted Claims

In Ground 1, Petitioner contends that "the trial court erred by extending the length of sentencing terms" because the "State did not file [a] notice of intent to seek enhanced punishment," as required under Tennessee law. (Doc. No. 1 at 8). Petitioner presented a sentencing argument in state court on direct appeal, but he did not present a federal constitutional argument. (*See* Doc. No. 7-10 at 21−24) (arguing that the trial court "misapplied the statutory enhancing and mitigating factors in determining [Petitioner's] sentence"). Because Petitioner did not alert the state courts to the federal nature of his sentencing claim, the claim is procedurally defaulted in this Court.[2] *Baldwin*, 541 U.S. at 29.

In Grounds 2 and 4, Petitioner contends that trial and elbow counsel were ineffective based on a number of allegations. (Doc. No. 1 at 9−10, 13). Of these, he presented only one to the Tennessee Court of Criminal Appeals, arguing that trial and elbow counsel were ineffective for failing to properly advise Petitioner of his right to a 12-person jury. (Doc. No. 7-21 at 33−34). All other bases underlying Petitioner's ineffective assistance of trial counsel claims are

---

[2]    Respondent persuasively argues that Petitioner likewise has not raised a federal constitutional claim challenging his sentence in these proceedings. (Doc. No. 9 at 18−19). Petitioner counters that his federal habeas claim implicitly relies on federal due process. (Doc. No. 15 at 1). Because the Court resolves this claim on procedural default, the Court need not address whether the claim is cognizable.

procedurally defaulted because he did not present them to the Tennessee Court of Criminal Appeals. *See Landrum v. Mitchell*, 625 F.3d 905, 918−19 (6th Cir. 2010) (holding that particular allegation of trial counsel's ineffectiveness was procedurally defaulted because petitioner did not raise it in state court, even though petitioner fairly presented ineffective assistance of trial counsel claim based on different alleged deficiencies).

Finally, in Ground 3, Petitioner contends that his convictions for facilitation of attempted second-degree murder and aggravated assault of Officer Miller violate double jeopardy principles. (Doc. No. 1 at 11). Petitioner did not present any double jeopardy argument to the Tennessee Court of Criminal Appeals, either on direct appeal or postconviction review. (*See generally* Doc. No. 7-10; Doc. No. 7-21). This claim is therefore procedurally defaulted.

Petitioner asserts that cause and prejudice may sometimes excuse a procedural default. (Doc. No. 15 at 8−9). That is true as a legal principle, but Petitioner does not identify any "cause" that would excuse his defaults here. Instead, he argues that "all the ineffective assistance of counsel claims raised in his petition were raised, to some extent and degree, during State Court review, sufficient to allow the claims to proceed herein." (*Id.* at 9). On this point, Petitioner is incorrect as a matter of law: to avoid default on a claim, he must have presented it to the Tennessee Court of Criminal Appeals. *Adams*, 330 F.3d at 401. Because he has failed to present all his claims except one—ineffective assistance of trial counsel based on failure to properly advise Petitioner regarding his right to a 12-person jury—to the Tennessee Court of Criminal Appeals, those claims are procedurally defaulted. And because he has not shown cause and prejudice or any other reason to excuse the defaults, the claims will be denied on that basis.

**B. Remaining Ineffective Assistance of Trial Counsel Claim**

Petitioner's only non-defaulted claim—ineffective assistance of trial counsel based on the allegation that counsel did not properly advise Petitioner regarding his right to a 12-person jury—does not warrant habeas corpus relief.

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. *See Bell v. Cone*, 535 U.S. 685, 694−95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 686−87 (1984). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

As discussed above, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law as clearly established at the time in the holding(s) of the United States Supreme Court, "involved an unreasonable application of" such law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1), (2). Thus, where (as here) a claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Instead, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

The Tennessee Court of Criminal Appeals adjudicated Petitioner's ineffective-assistance-of-trial-counsel claim on postconviction review, holding that Petitioner failed to demonstrate deficient performance or prejudice:

> At the post-conviction hearing, elbow counsel, a seasoned defense attorney, testified that although he did not recall the exact conversation he had with the Petitioner during the in-court recess, he was certain that he explained to the Petitioner his right to twelve jurors. Elbow counsel noted that he would never allow a defendant to proceed to trial without having explained this right, which he characterized as "just fundamental." In addition, trial counsel confirmed that elbow counsel conversed with the Petitioner during the brief in-court recess, and the hearing transcript reflects that elbow counsel asked the trial court for an opportunity to speak privately with the Petitioner. The post-conviction court credited elbow counsel's testimony. Elbow counsel and trial counsel were not deficient in this regard because at least one member of the defense team informed the Petitioner of his right to twelve jurors.

> Likewise, the Petitioner has not established prejudice. At the post-conviction hearing, the Petitioner indicated that he had prior experience with the criminal justice system and that he was generally aware that he was entitled to twelve jurors. Moreover, elbow counsel testified that he advised the Petitioner to proceed with eleven jurors because he felt the remaining jurors were favorable to the Petitioner. We note that this tactic was somewhat successful, resulting in the Petitioner's conviction for the lesser-included offense of facilitation of attempted second degree murder. The Petitioner has failed to establish that he was prejudiced, and he is not entitled to relief on this basis.

(Doc. No. 7-23 at 12). Petitioner has not demonstrated that the Tennessee Court of Criminal Appeals reached an unreasonable decision on either prong.

Petitioner does not dispute the state court's finding that he was informed of his right to a 12-person jury. (Doc. No. 15 at 5) (acknowledging elbow counsel's testimony that he informed Petitioner of his "'absolute right' to a twelve-person jury"). He argues, however, that he should have received additional admonitions from the trial court and trial counsel. (*Id.* at 5−8). State law determines which admonitions are necessary, as the right to a 12-person jury is guaranteed only by state law, not the federal Constitution. *See Williams v. Florida*, 399 U.S. 78, 100 (1970) ("[T]he 12-man requirement cannot be regarded as an indispensable component of the Sixth Amendment."). And it is not this Court's role to second-guess a Tennessee court's application of

19

Tennessee law. *Thomas v. Stephenson*, 898 F.3d 693, 701 (6th Cir. 2018) ("[I]t is 'not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'" (quoting *Estelle v. McGuire*, 502 U.S. 62, 67−68 (1991)). The Tennessee Court of Criminal Appeals therefore did not unreasonably apply *Strickland* or any other Supreme Court precedent in concluding that trial and elbow counsel's performance was not deficient.

Likewise, the Tennessee Court of Criminal Appeals reasonably held that Petitioner had failed to demonstrate prejudice. Indeed, even in his filings in this Court, Petitioner does not assert—let alone demonstrate—a reasonable probability that the outcome of his trial would have been different if counsel had advised him differently regarding the right to a 12-person jury.

Because the Tennessee Court of Criminal Appeals reasonably held that counsel's performance was neither deficient nor prejudicial, 28 U.S.C. § 2254(d) bars relief on Petitioner's claim of ineffective assistance of counsel.

## V.   Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas corpus petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required

showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Here, because jurists of reason would not disagree with the resolution of Petitioner's claims, the Court will deny a certificate of appealability. However, Petitioner may seek a certificate of appealability from the Sixth Circuit.

## VI. Conclusion

As discussed above, the Court will deny Petitioner's 28 U.S.C. § 2254 petition for writ of habeas corpus and dismiss this action with prejudice. A certificate of appealability will not be granted in this Court, but Petitioner may seek one in the Sixth Circuit. An appropriate Order shall enter.

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE